989 So.2d 1277 (2008)
Dana Rene RITTER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D07-4604.
District Court of Appeal of Florida, Second District.
September 12, 2008.
*1278 James Marion Moorman, Public Defender, and Cynthia J. Dodge, Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Chandra Waite Dasrat, Assistant Attorney General, Tampa, for Appellee.
STRINGER, Judge.
Dana Rene Ritter seeks review of the order withholding adjudication and placing her on probation, which was entered after the trial judge found her guilty of grand theft. Ritter argues that the judge may have based his finding of guilt on behavior not charged in the information. We agree and reverse on this basis.
The State charged Ritter with third-degree grand theft by "knowingly and unlawfully obtain[ing] or us[ing], or endeavor[ing] to obtain or use, certain property of another, to-wit: CHECK AND/OR U.S. CURRENCY, the property of LORI HABIB, the value of said property being three hundred ($300.00) dollars or more, but less than five thousand ($5,000.00) dollars" with the intent to "permanently or temporarily deprive the said LORI HABIB of a right to the property or a benefit therefore, or to appropriate the property to ... her own use or to the use of any person not entitled thereto."
Ritter waived her right to a jury trial, and the case proceeded before the trial judge. Lori Habib testified that she was a friend of Ritter's and that she worked for Ritter as "in-home support" taking care of Ritter's disabled daughter. Ritter paid Habib through an agency called Dream Weavers. Habib received a paycheck from Dream Weavers every two weeks for work already performed. According to Habib, Ritter took care of the bookkeeping and submitted Habib's hours.
Habib stopped working for Ritter in July because she was going to Massachusetts. Habib said that Ritter was upset when Ritter found out that Habib was having another friend take care of her cat while Habib was away. Habib left for Massachusetts on July 12, 2006, and Ritter drove Habib and Habib's sister to the airport. At this time, Dream Weavers owed Habib two paychecks for hours submitted. Habib herself owed Ritter $127 from a personal debt.
When Habib returned from Massachusetts on July 29, 2006, she discovered that she had not received her paychecks. The friend who was taking care of Habib's cat had caught Ritter taking a paycheck out of Habib's mailbox. Habib confronted Ritter, who admitted that she took a paycheck out of Habib's mailbox because she could not wait until July 29 for the $127 that Habib owed her. This paycheck was in the amount of $771.98, and it was issued for "in-home support" work done in the two weeks prior to July 12, 2006.
*1279 Habib then phoned Ms. Stewart at Dream Weavers, and Stewart sent Habib two photocopies showing that Ritter had deposited Habib's last two paychecks into Ritter's account. Stewart told Habib that Ritter had recently called and said that Habib had not received the second paycheck. Ritter told Stewart that Habib wanted the second paycheck sent to Ritter's house. Stewart complied and sent the second check to Ritter's house. This paycheck was in the amount of $700, and it was issued for "respite" hours.
Although both checks had been endorsed with Habib's name, Habib asserted that she did not sign the checks. Ritter's name had also been endorsed on both checks. Habib testified that she did not give Ritter permission to cash the checks and Ritter did not give her any money for the checks.
Ritter testified that her disabled daughter is totally dependent on others for feeding, bathing, and traveling. Ritter is her sole caregiver outside of school. Ritter explained that Dream Weavers is a private company with a provider number through the State of Florida. Ritter's daughter receives a grant from the State of Florida each year from August 1 to July 31 of the following year. The grant for the year in question was $14,700, and it was broken into categories such as durable medical equipment, in-home support, respite, and durable medical supplies. Respite hours are overnight hours similar to in-home support.
Ritter explained that Habib kept track of her own hours. Ritter had no control over Habib's pay, but she did determine how many hours each day she needed Habib. Habib's sister arrived on either June 26 or June 27 and stayed until July 12 when Ritter drove them to the airport. Habib did not work any hours for Ritter during those two weeks. When Habib did not work for her, Ritter had to pay someone else out of her own pocket to care for her daughter.
Ritter did not deny cashing Habib's paychecks but asserted that Habib gave her permission to take the paychecks in compensation for the money that Ritter paid out for care that was given by someone other than Habib. Ritter and Habib agreed that Habib would still report hours to Dream Weavers for compensation while Habib was unavailable. Habib agreed to do this because she knew Ritter had to pay someone else while she was gone and Ritter did not know another licensed caregiver who could get paid directly from Dream Weavers.
Ritter took the first paycheck around July 12 or 13. Ritter testified that she called Habib in Boston and told Habib that the check from Dream Weavers had arrived. Habib told Ritter to sign Habib's name to the check and cash it at Peggy's Corral. Ritter did not feel comfortable cashing the check at Peggy's Corral, so she deposited it into her bank account. When Habib found out that Ritter did not cash the check at Peggy's Corral, Habib called Ritter "explicit names" and hung up on her from Massachusetts.
Ritter admitted that she called Stewart about the second paycheck and asked that the check be sent to her. Ritter claimed that Habib never asked her about the second paycheck. Ritter explained that she did not believe Habib was entitled to either check because she did not do the work. Ritter admitted that she did not tell Dream Weavers that Habib did not do the work because she needed the money to pay someone else for the care Habib was not providing.
Habib acknowledged that her sister was in town during that two-week period and that Habib went to Ritter's house only a *1280 couple of times. Habib denied that she asked Ritter to pick up her paychecks. However, Habib eventually admitted that after she discovered that Ritter took the first paycheck out of her mailbox, she gave Ritter permission to cash the check at Peggy's Corral. The person at Peggy's was going to give Ritter the $127 Habib owed her and put the rest in the safe for Habib until she got back. Brian Holland, a long-time friend of Ritter's, testified he heard Habib give Ritter permission to take the first paycheck on the speakerphone at Ritter's apartment.
After hearing all the evidence, the judge found Ritter guilty of grand theft, stating:
All right. Dreamweaver [sic] clearly had a relationship with Ms. Habib as an employer/employee. Ms. Habib was licensed or credentialed, certified, she has the proper number, according to Dreamweaver, to provide the services. I did not hear testimony and evidence, nor do I believe that it's likely that Dreamweaver would simply provide moneys to Ms. Ritter to give to whoever she wished, to give to whatever caregiver Ms. Ritter was able to find. Dreamweaver, Ms. Stewart, provided moneys to Ms. Habib to provide these services, caregiver services. So at best, Ms. Habib and Ms. Ritter committed a fraud upon Dreamweaver when they both represented to Dreamweaver that Ms. Habib worked these hours and provided this respite care such that Ms. Habib should be paid for it. That's the best-case scenario for Ms. Ritter, that she engaged in a fraud upon Dreamweaver, Ms. Stewart, to collect these moneys.
Now, I know that Ms. Ritter believed that she's entitled to those moneys based upon the grant, but she's entitled to those moneys to provide health care and respite services to someone who's properly licensed, who has the correct number, that Dreamweavers has checked out and is employed by. Dreamweaver is not simply providing moneys to Ms. Ritter to do with what she will, to trust her to pay these caregivers.
So that's best-case scenario for Ms. Ritter, that she knew that the grant was ending, she knew that she was going to have to get help while Ms. Habib was away, and that she persuaded Ms. Habib to submit fraudulent hours so that Ms. Ritter could get paid $1,400 by Dreamweaver.
Worst-case scenario for Ms. Ritter is that Ms. Habib did not give her permission to forge her name, and that these moneys were intended for Ms. Habib. And that because Ms. Ritter believed that Ms. Habib had not worked all these hours that she was claiming, that she was not going to let her keep those moneys, because she did not believe Ms. Habib was entitled to them.
Either case is not good for Ms. Ritter. That is, that she and Ms. Habib engaged in this fraud upon Dreamweaver to get moneys from Dreamweaver. Not to go to Dreamweaver's employee, the person with the license, the person with the number, the person that Dreamweaver is expecting to provide the services, but to go to Ms. Ritter so that she can  we will presume  give the money to someone else.
As I said, that's best-case scenario. Worst-case scenario is that she was simply unhappy that Ms. Habib left fairly suddenly without giving her sufficient notice, that she spent too much time with her sister, and that she knew that Ms. Habib was likely to submit hours that she wasn't entitled to. And Ms. Ritter took it upon herself  rather than call Dreamweaver and say she didn't work these hours, don't pay her for *1281 these hours  she believed that she would take the money herself.
In either case, there's a fraud here. In either case, even if you believe Ms. Ritter, she perpetuated a fraud against Dreamweaver, as I said, by accepting these moneys with the name of Lori Habib on them, when she knew full well that Lori Habib had not worked those hours, and that these moneys were in payment for hours worked by Lori Habib.
Having listened to all the testimony and evidence, having found that  having reviewed all the documentation provided, I will find that indeed the State has proven beyond a reasonable doubt that Ms. Ritter is guilty of grand theft, and will find her so.
Ritter filed a timely motion for new trial arguing that the judge erred in finding Ritter guilty based on alternate theories, one of which was not alleged in the information. The judge denied the motion. The judge subsequently withheld adjudication and placed Ritter on eighteen months' probation with the special conditions of fifty hours of community service and restitution.
On appeal, Ritter argues that the judge abused his discretion by denying her motion for new trial because he may have found her guilty of a crime not charged in the information. It is well-settled that it is error to convict a defendant of a crime that has not been charged and is not a lesser-included offense. Ray v. State, 403 So.2d 956, 959 (Fla.1981); C.W. v. State, 861 So.2d 1243, 1243 (Fla. 2d DCA 2003). In this case, the judge determined that Ritter defrauded Dream Weavers either in conjunction with Habib or without Habib's knowledge by cashing Habib's checks and using the proceeds to pay another person to care for her daughter. If Ritter cashed Habib's checks without her knowledge and used the proceeds to pay another person, Ritter would be guilty of grand theft as charged. However, if Ritter cashed Habib's checks in conjunction with Habib, she would not be guilty of grand theft as charged. Ritter might be guilty of grand theft against Dream Weavers in the latter scenario, but Ritter was not charged with any crimes against Dream Weavers.
This case is analogous to those cases in which the jury is erroneously instructed on a theory not charged in the information and the jury returns a general verdict. See, e.g., Sanders v. State, 959 So.2d 1232 (Fla. 2d DCA 2007); Debose v. State, 920 So.2d 169 (Fla. 1st DCA 2006). In those cases, courts reverse the convictions and remand for new trials because it is impossible to determine whether the jury convicted the defendant on the uncharged theory. See, e.g., Debose, 920 So.2d at 170. In this case, the judge considered a theory not charged in the information by suggesting that Ritter was guilty of committing a fraud upon Dream Weavers by cashing Habib's checks and keeping the proceeds with Habib's knowledge and consent. The judge's verdict in this case was akin to a general verdict because it was impossible to determine whether the judge convicted Ritter based on the uncharged theory. Accordingly, we reverse and remand for a new trial before a different judge.
Reversed and remanded.
NORTHCUTT, C.J., and SILBERMAN, J., Concur.